FILED
2011 Oct-06  AM 08:22
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHWESTERN DIVISION

| | | |
|---|---|---|
| **SONJA D. KING,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. CV-08-S-0856-NW** |
| | ) | |
| **VOLUNTEERS OF AMERICA,** | ) | |
| **NORTH ALABAMA, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

Plaintiff, Sonja D. King, commenced this action against her former employer, Volunteers of America, North Alabama, Inc., on May 14, 2008.[1]  Her complaint contained six claims: *i.e.*, three federal claims for alleged racial harassment, race discrimination, and retaliation, pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000(e), *et seq*. ("Title VII") and Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981 ("§ 1981"), as well as three state law claims for slander, invasion of privacy, and negligent and/or wanton hiring, training, supervision and/or retention.[2]  Defendant moved for summary judgment on all claims except plaintiff's racial harassment claim.[3]  On February 19, 2010, the court granted that

---

[1] *See* doc. no. 1 (Complaint).

[2] *Id.*

[3] See doc. no. 40 (Defendant's Motion for Summary Judgment).

motion, and entered summary judgment in favor of defendant on all claims except plaintiff's racial harassment claim.[4]

After the court's summary judgment order was entered, the United States Supreme Court entered its opinion in *Staub v. Proctor Hospital*, — U.S. —, 131 S. Ct. 1186 (2011), and the Eleventh Circuit entered its opinion in *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321(11th Cir. 2011), both of which alter the law applicable to this case.  During a pretrial conference held on August 26, 2011, plaintiff asserted that *Staub* and *Smith* rendered the earlier summary judgment order erroneous as to the racial discrimination and retaliation claims.  Plaintiff filed an amended complaint on August 27, 2011, for the purpose of asserting facts supporting a theory of liability under *Staub* and *Smith*.[5]  The case now is before the court on defendant's motion for summary judgment on the amended complaint.[6]  Defendant argues that it is entitled to summary judgment on all claims asserted in plaintiff's amended complaint, *i.e.*, plaintiff's racial discrimination, retaliation, and racial harassment claims.

## I.  LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that summary judgment "should

---

[4] See doc. no. 59 (Order Granting Defendant's Motion for Summary Judgment).

[5] Doc. no. 74 (Amended Complaint); *see also* doc. no. 72 (Scheduling Order) (allowing plaintiff until August 27, 2011, to file an amended complaint).

[6] Doc. no. 76 (Defendant's Motion for Summary Judgment on the Amended Complaint).

2

be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).[7]  In other words, summary judgment is proper "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "A genuine issue of material fact 'exists only if sufficient evidence is presented favoring the nonmoving party for a jury to return a verdict for that party.'" *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1336 (11th Cir. 1999) (quoting *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1284-85 (11th Cir. 1997)).

"In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)). "[A]n inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence,

---

[7] Rule 56 was amended, effective December 1, 2010, in conjunction with a general overhaul of the Federal Rules of Civil Procedure.  The Advisory Committee was careful to note, however, that the changes "will not affect continuing development of the decisional law construing and applying these phrases." Adv. Comm. Notes to Fed. R. Civ. P. 56 (2010 Amends.) (emphasis supplied). Consequently, cases interpreting the previous version of Rule 56 are equally applicable to the revised version.

but is pure conjecture and speculation." *Daniels v. Twin Oaks Nursing Home*, 692

F.2d 1321, 1324 (11th Cir. 1983).  Moreover,

> [t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case.  The relevant rules of substantive law dictate the materiality of a disputed fact.  A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921); s*ee also Anderson v.*

*Liberty Lobby*, *Inc.*, 477 U.S. 242, 251-52 (1986) (asking "whether the evidence

presents a sufficient disagreement to require submission to a jury or whether it is so

one-sided that one party must prevail as a matter of law").

## II.  FACTS[8]

---

[8] Plaintiff's brief in opposition to defendant's motion for summary judgment on the amended complaint is rife with citation errors. *See* doc. no. 80 (Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment on the Amended Complaint).  Plaintiff repeatedly cites parts of the record that not only do not support the assertion for which they are cited, but are often entirely unrelated to the assertion.  Plaintiff's brief frequently cites a page of a document that does not exist.  For example, in  paragraph fourteen on page eight of plaintiff's brief, plaintiff cites to "Doc. 43-5, pp. 7-8, 10, 12," but document number 43-5 contains only ten pages. *See* doc. no. 43 (Memorandum and Evidentiary Materials in Opposition to Defendant's Motion for Summary Judgment), Ex. 5 (Declaration of Natasha Yolanda Fuqua).  That, and similar citation errors, made it difficult to follow plaintiff's arguments.  Plaintiff, the non-movant, bears the burden to designate specific facts showing that there is a genuine issue of material fact. *Celotex*, 477 U.S. at 324 ("Rule 56[c] therefore requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'").  Further, the court is not required to search through all of the parties' evidentiary submissions. S*ee Jones v. Sheehan, Young & Culp, P.C.*, 82 F.3d 1334, 1338 (5th Cir. 1996); *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995).  Even so, in an effort to give plaintiff every possible benefit at this summary judgment stage, this court has undertaken great pains to comb through the parties' evidentiary submissions to determine the relevant facts.  Plaintiff's counsel is advised to take greater care in drafting future briefs for this

Plaintiff, Sonja D. King, is an African-American ("black") female who began working for Volunteers of America, North Alabama, Inc. ("Volunteers") in 2002 as a "direct care aide" in Florence, Alabama.[9]  Volunteers is a Christian human services organization that provides material and spiritual assistance to persons in need of sustenance and guidance.[10]  Volunteers operates group homes in Florence, Alabama, serving the needs of developmentally-challenged adults and adolescents.[11]

Plaintiff was forced to take a leave of absence from her employment with Volunteers in December 2003, as a result of her deployment to Iraq, to fulfill her duties as a member of the Alabama National Guard.[12]  Upon her return from active duty, plaintiff interviewed for a "service coordinator" position, which was a promotion over the direct care aide position she formerly held.[13]  Victor Tucker ("Tucker"), the Chief Executive Officer ("CEO") of Volunteers,[14] interviewed plaintiff and awarded her the service coordinator position during April of 2005.[15]

court, as this court will not be so indulgent in future cases.

[9] Doc. no. 43, Ex. A (Declaration of Sonja King) 1, 6; doc. no. 42 (Brief and Evidentiary Materials in Support of Defendant's Motion for Summary Judgment), Ex. A (Deposition of Sonja King) 34:8-11.

[10] Doc. no. 42, Ex. A(15) (Volunteers of America, North Alabama Personnel Policies, Updated March 2006) 5.

[11] *Id.*

[12] *Id.* at 36:24-37:2.

[13] *Id.* at  37:11-38:12, 39:11-22, 40:7-17.

[14] Declaration of Sonja King 2.

[15] *Id.* at 7; Deposition of Sonja King 38:9-10.

Teresa Stephenson ("Stephenson"), the Program Director for the Florence, Alabama operations,[16] then became plaintiff's direct supervisor.[17] Both Tucker and Stephenson are white.[18]

Tucker works out of the main office of Volunteers in Huntsville, Alabama.[19] Also employed in the Huntsville office, in the Human Resources Department, were Cordia Bolden ("Bolden") and Robin Bucklin ("Bucklin").[20] Bolden is black, and Bucklin is white.[21]

## A.   Anti-Harassment Policies Adopted by Volunteers

Plaintiff acknowledges receiving a copy of the personnel policies of Volunteers within a week of beginning her employment in 2005.[22] Those policies contain the following provisions prohibiting racial harassment:

It is the policy of [Volunteers] that it will not tolerate verbal or physical conduct by any employee that harasses, disrupts, or interferes with another's work performance or which creates an intimidating, offensive, or hostile environment.

---

[16] Declaration of Sonja King 7.

[17] *Id.* at 8.

[18] *Id.* at 2, 7.

[19] *Id.* at 2.

[20] *Id.* at 20; doc. no. 78 (Evidentiary Materials in Support of Defendant's Motion for Summary Judgment on the Amended Complaint), Ex. 2 (Affidavit of Cordia Bolden, Sept. 2, 2011) 1.

[21] Affidavit of Cordia Bolden, Sept. 2, 2001, at 1; Deposition of Sonja King 54:23-55:3.

[22] Deposition of Sonja King 120:8-21.

All employees have the right to a work environment free from intimidation and harassment. This company prohibits any physical, verbal, or visual harassment of any employee.

. . .

B.   Each supervisor has a responsibility to maintain a work place that is free of any form of harassment. Harassment includes, but is not limited to:

1.   Verbal abuse of a racial or national origin nature.

2.   Slurs or epithets about an individual's race or national origin.

3.   Jokes that belittle or make fun of an individual's race or national origin.

4.   Distribution of literature or material that is degrading to any race or national origin.

C.   Any employee who believes that the actions or words of a supervisor or fellow employee constitute unwelcome harassment has a responsibility to report or complain as soon as possible to their supervisor and/or to the Human Resources Department or CEO.

D.   All complaints of harassment will be investigated promptly as directed by the CEO with an emphasis upon complete impartiality and confidentiality. In all cases, the employee is to be advised of the management's findings and conclusion.

E.   Any employee, supervisor, or manager who is found after appropriate investigation to have engaged in harassment of another employee will be subject to appropriate disciplinary action, depending on the circumstances, up to

7

and including termination.[23]

**B.     Racially Harrasing Remarks by Plaintiff's Supervisor and Co-Workers**

At all times during plaintiff's employment with Volunteers, her supervisor,

Stephenson, and other white employees — specifically Sarah Rickards, Amy Johnson,

Carrie Rickards, Melissa Castle, and Debbie Williamson in the Florence, Alabama

operations of Volunteers — used racist language on a nearly daily basis.[24] Generally,

the employees made the following remarks:

"Black people have a nasty attitude; they're nasty; they're ignorant."

"[I'm n]ot going to hire any black dudes here because they are drug dealers and might damage the clients."

"Black clients have poop on their assess all of the time."

"Old black women are good for nothing."

"You know how black people are."

"Like nigger trash."

"She is too black."

"All black guys are good for is to be in jail and drug dealers."

"White girls who like black guys are 'nigger lovers.'"

"All black people are good for is cleaning up poop off our client's

---

[23] Doc. no. 42, Ex. A(15) (the personnel policies of Volunteers) 36-37.

[24] Declaration of Sonja King 10; Deposition of Sonja King 159:12-206:14.

asses."[25]

In addition to these daily comments, the same employees made race-based comments on a more isolated basis. Sarah Rickard said that she did not like her daughter talking to black men, and that she did not want to have black people in her family.[26] Sarah Rickard agreed with Stephenson when she said that all black people are good for is cleaning up poop.[27] Sarah Rickard asked white employees to go out to lunch with her, but did not ask plaintiff or other black employees out to lunch.[28] She also showed favoritism towards white clients in her displays of affection.[29]

Amy Johnson used the words "nigger" and "black," and said that she dislikes black females.[30]

Carrie Rickards made comments about differences between black and white people, and asked why black people's hair gets "nappy" when it rains and why black women's "butts are different."[31]

---

[25] Declaration of Sonja King, 10; Deposition of Sonja King, 159:12-206:14. This court "do[es] not explicate this vulgar language lightly, but only because its full consideration is essential to measure whether these words and this conduct could be read as having created 'an environment that a reasonable person would find hostile or abusive.'" *Reeves v. C.H. Robinson, Inc.*, 594 F.3d 798, 803 (11th Cir. 2010) (*en banc*) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998)).

[26] Deposition of Sonja King 166:10-23.

[27] *Id.* at 166:24-167:1.

[28] *Id.* at 171:12-16.

[29] *Id.* at 171:17-1.

[30] *Id.* at 176:18-21, 178:4-14, 177:5-6.

[31] *Id.* at 180:19-25.

Melissa Castle said that black women are "nasty, ignorant, [and] dumb," and that black men consequently prefer white women romantically.[32]  She insinuated that plaintiff must be dating a drug dealer because she dressed so nicely at work.[33]  She used the word "nigger."[34]  She wrote  and posted a letter referring to a white employee who was romantically interested in black men as "nigger trailer trash."[35]

Debra Williamson said that she was tired of black staff because they make up lies, gossip, and make mistakes.[36]  She expressed dissatisfaction that a white coworker had a child with a black man.[37]  She stated that she could not believe that plaintiff was so well educated and had accomplished so much in life when, at plaintiff's age, "most black females already got two or three kids on welfare [and] food stamps."[38]

Teresa Stephenson, plaintiff's supervisor, asked why plaintiff was so nicely dressed for work and asked plaintiff questions about her personal and family life.[39]  She made numerous derogatory comments about "blacks" in general, including comments that black persons are "nasty" and "dumb."[40]  Stephenson stole Christmas

---

[32] Deposition of Sonja King 183:12, 183:13-14.

[33] *Id.* at  183:22-184:11.

[34] *Id.* at 186:23-24.

[35] *Id.* at 187:25-189:5.

[36] *Id.* at 185:19-21.

[37] *Id.* at 186:4-7.

[38] Deposition of Sonja King at 186:11-20.

[39] *Id.* at 194:7-14.

[40] *Id.* at 159:12-206:14.

money intended for presents for black clients, but gave the white clients their Christmas presents.[41]

## C.    Plaintiff's Disciplinary History and Complaints of Racial Harassment

Plaintiff received six written reprimands for violations of company policy throughout her employment with Volunteers.  All reprimands were given to Plaintiff by Stephenson, at the direction of Bolden in the Human Resources Department of Volunteers.[42]  Plaintiff received the first written reprimand on March 29, 2006, for allegedly allowing other employees to listen while she disciplined staff members, and for disclosing confidential information about co-workers to other staff members.[43] Plaintiff denies both allegations.[44]  According to defendant, the reprimand arose as a result of reports made by a staff member or members,[45] but plaintiff asserts that staff members generally acted at Stephenson's direction for the purpose of furthering Stephenson's plot to discriminate against black employees because of their race.[46]

---

[41] *Id.* at 197:12-17.

[42] Affidavit of Cordia Bolden 3 ¶ 9, Sept. 2, 2011.

[43] Deposition of Sonja King 48-54; *id.*, Ex. A(7) (Written Reprimand dated March 29, 2006).

[44] Declaration of Sonja King 26-27.

[45] Doc. no. 78, Ex. 1 (Affidavit of Teresa Stephenson) 3 ¶ 7 ("This coaching opportunity came about because the employee that listened in on the reprimand of the other employee called me, and said that Sonja had asked her to be on the phone, and she now felt bad about it."); *id.* at Ex. A(1) ("3 staff reported being on phone w/ Sonja while she reprimands other staff").

[46] *See* Deposition of Sonja King 54:7-11 ("Staff had told me that Teresa had them [say] things about me and told — Teresa told them what to say about me as far as complaining because she wanted me to get out of there."); doc. no. 43, Ex. C (Declaration of Teresa Slatton) 5 ¶ 6 ("I personally observed that Teresa Stephenson used [Volunteers'] employees, especially black

Stephenson reported the staff member's statement concerning the improper disciplining by plaintiff to Human Resources.[47]   At the direction of the Human Resources Department, Stephenson obtained a statement from the reporting staff member, and issued a reprimand to plaintiff.[48]

On an unknown day in March 2006, but prior to her March 29, 2006 reprimand for improperly disciplining staff members, plaintiff complained to Tucker, the CEO of Volunteers, about what she perceived to be racially offensive behavior.[49]   Plaintiff stated that she no longer enjoyed working for Volunteers, and Tucker asked her why.[50]   Plaintiff stated that black individuals were being "mistreated," and she asked Tucker what he could do about it.[51]   Tucker stated that he would speak with Stephenson, offered to meet with plaintiff at another time to discuss her complaints in detail, and suggested that plaintiff email him more information about the situation.[52]   Tucker offered to meet plaintiff at an Applebee's in Athens, Alabama —

---

employees, against other black employees at [Volunteers].  I personally observed that Teresa Stephenson would instruct [Volunteers'] employees, especially black supervisors, to make up falsehoods about black employees so the black employees could be fired."); *see also* doc. no. 81, at 35-37.

[47] Affidavit of Teresa Stephenson 3 ¶ 7.

[48] *Id.*

[49] Declaration of Sonja King 24; Deposition of Sonja King 208:19-209:13.

[50] Deposition of Sonja King 209:1-7.

[51] *Id.* at 209:2-7.

[52] *Id.* at 209:7-13.

a location approximately halfway between Tucker's workplace in Huntsville, Alabama and plaintiff's home in Rogersville, Alabama — to discus her complaints.[53] Plaintiff did not meet Tucker at the Applebee's, however, and did not communicate her complaints to Tucker again.[54] Plaintiff did not meet Tucker at the Applebee's because she did not feel comfortable meeting him there, but she never communicated that to Tucker, or suggested a different meeting place.[55]

Plaintiff received a second written reprimand on July 24, 2006, for making negative comments and releasing information about a former employee in response to an inquiry from a prospective employer of that former employee.[56] The personnel policies of Volunteers, which plaintiff acknowledged she received and understood, provided in pertinent part that "[r]eference letters furnished to prospective employers of present or former employees will be based on factual material contained in the staff member's personnel file."[57] Volunteers prohibits its employees from making derogatory remarks about other employees to persons who are not employed by

---

[53] *Id.* at 209:14-210:6.

[54] *Id.* at 209:25-211:23.

[55] Deposition of Sonja King 211:5-23.

[56] *Id.* at 84:7-100:10; doc. no. 42, Ex. A(10) (Written Reprimand dated July 24, 2006).

[57] Doc. no. 42, Ex. A(15) (Volunteers of America, North Alabama Personnel Policies dated March 2006) 13; *id.*, Ex. A(16) (Acknowledgment Form Signed by Sonja King on July 31, 2002); Deposition of Sonja King 120:8-21.

Volunteers.[58]   Plaintiff does not dispute that she released the information, but "emphatically denies that she told the inquiring party anything other than exactly what Stephenson told her to tell the inquiring party."[59]   The former employee, Latoya Parks Hardy, an African-American, complained to Tucker.[60]   Tucker directed the Human Resources Department to conduct an investigation.[61]   Bolden contacted Stephenson, who spoke to the prospective employer and reported back to Bolden.[62] Bolden completed her investigation and directed Stephenson to reprimand plaintiff.[63]

Plaintiff alleges she made complaints on *several* occasions to Bolden and Bucklin in the Human Resources Department about the racially harassing conduct of other employees,[64] but she only provides evidence of one specific complaint. Plaintiff met with Bolden and Bucklin during August or September 2006, and complained

---

[58] Affidavit of Victor Tucker ¶ 23 ("Moreover, the Company and I prohibit any Volunteers employee, as part of their job, from making derogatory remarks about another Volunteers employee to a person outside of Volunteers.  Likewise, the Company and I prohibit any Volunteers employee (other than HR) from giving job references about former Volunteers employees.  In fact, under Volunteers' Personnel Policies, only written references may be provided to prospective employers of present or former Volunteers employees, and all references must be based on factual material contained in the staff member's personnel file."); doc. no. 42, Ex. A(15) (Volunteers of America, North Alabama Personnel Policies dated March 2006) 13 ("Reference letters furnished to prospective employers of present or former employees will be based on factual matter contained in the staff member's personnel file. Only job titles and dates employed in each position will be verified.").

[59] Doc. no. 43, at 7.

[60] Affidavit of Teresa Stephenson ¶ 8; Affidavit of Victor Tucker ¶ 17, Ex. 8, at 3-5.

[61] Affidavit of Teresa Stephenson) ¶ 8; Affidavit of Victor Tucker ¶ 17, Ex. 8 at 3.

[62] Affidavit of Teresa Stephenson ¶ 8.

[63] *Id.*

[64] Deposition of Sonja King 207:13-14.

about other employees' racially offensive behavior.[65]  Approximately two days later, Stephenson announced in a meeting that she always finds out about any complaints made to the Human Resources Department and advised her employees that "it would be best for you not to even say anything, period, if you want your job."[66]

Plaintiff received four reprimands on November 13, 2006, the day she was placed on administrative leave.  The first reprimand issued that day was because the heating unit in Group Home No. 26 — a home under plaintiff's supervision — was not working, and plaintiff failed to address the problem despite complaints.[67]  The reprimand resulted from complaints made to Stephenson by another employee.[68]  Plaintiff admits being aware that the heating unit did not work,[69] but she claims she addressed the situation by reporting the issue to both Stephenson and Langdon Conaway, the employee in the main office of Volunteers who was responsible for identifying problems with homes operated by Volunteers.[70]  According to plaintiff, both Stephenson and Conaway repeatedly told her not to worry about the heating

---

[65] Declaration of Sonja King 31.

[66] Declaration of Sonja King 31-32.

[67] Affidavit of Teresa Stephenson, Ex. C (Written Reprimand of Sonja King dated Nov. 13, 2006 Regarding the Heating System).

[68] Affidavit of Teresa Stephenson ¶ 10; *id.* at Ex. C ("Staff report you said 'I'm not putting no money in that house since we are going to move soon.' This was reported to me, [Stephenson], on 11/12/06.").

[69] Deposition of Sonja King 111:6-18.

[70] *Id.* at 111:23-113:11.

15

system, because Volunteers planned to move out of that home soon.[71]  Stephenson

denied that assertion, however, saying that she "never told Ms. King not to worry

about the heating unit or not to spend money on the heating unit."[72]

The second reprimand issued to plaintiff on November 13, 2006, was for

allowing Cassandra Nichols ("Nichols"), who worked under plaintiff's supervision,

to correct her own time sheet.[73]  As a service coordinator, plaintiff was required by

the personnel policies of Volunteers to know her staff's work schedules and to

approve all overtime hours.[74]  Plaintiff admits that she did not know when Nichols

clocked in or out, because she did not know Nichols' work schedule.[75]  As a result,

plaintiff relied on Ms. Nichols to correct her own time sheet.[76]  Discrepancies in

Nichols' time sheet entries resulted in an investigation begun by Susan Hester in the

Payroll Department.[77]  Plaintiff acknowledges that she was Nichols' immediate

supervisor, but insists that Sarah Rickard and Amy Johnson — two other employees

in the Florence, Alabama operations of Volunteers — actually issued Nichols her

---

[71] *Id.*

[72] Affidavit of Teresa Stephenson ¶ 13.

[73] *Id.*, Ex. E (Written Reprimand of Sonja King dated Nov. 13, 2006 Regarding E-Time).

[74] Doc. no. 42, Ex. A(15) (Volunteers of America, North Alabama Personnel Policies dated March 2006) 14.

[75] Declaration of Sonja King 51.

[76] *Id.*

[77] Doc. no. 42, Ex. A(15) (Volunteers of America, North Alabama Personnel Policies dated March 2006) at 14.

assignments.[78]  Plaintiff also claims that she should not be expected to know Nichols'

schedule because Stephenson never gave her a copy of the schedule.[79]

The third reprimand issued to plaintiff on November 13, 2006, was for

plaintiff's failure to cooperate with the investigation into Nichols' time sheet entries.[80]

Bolden directed Stephenson to issue plaintiff a reprimand for her failure to

cooperate.[81]  Bolden testified that plaintiff "was uncooperative and defensive any time

I asked her questions about Ms. Nichols or the hours she worked.  [Plaintiff's] actions

caused unneccessary delay in the investigation.  [Plaintiff's] failure to cooperate

contributed to that investigation being inconclusive."[82]  With regard to this reprimand,

plaintiff claims that she cooperated with the investigation, but simply refused to state

that Nichols was "stealing time."[83]

The fourth and final reprimand issued to plaintiff on November 13, 2006, was

for violating the personnel policies of Volunteers by engaging in frequent contact

with Nichols during the time that Nichols was on administrative leave.[84]   Bolden

---

[78] Declaration of Sonja King 36.

[79] *Id.* at 37.

[80] Affidavit of Teresa Stephenson, Ex. F (Written Reprimand of Sonja King dated Nov. 13, 2006 Regarding King's Failure to Cooperate).

[81] Affidavit of Cordia Bolden, Sept. 2, 2011, at ¶ 13.

[82] *Id.* at ¶ 10.

[83] Doc. no. 43, at 16.

[84] Affidavit of Teresa Stephenson, Ex. D (Written Reprimand of Sonja King dated Nov. 13, 2006 Regarding Contact with Employee on Administrative Leave); Deposition of Sonja King, at

directed Stephenson to issue plaintiff a reprimand for the contacts.[85]  Plaintiff admits

that she spoke over the phone with Nichols several times while Nichols was on

administrative leave.[86]  Even so, plaintiff claims that she was told to investigate the

allegations against Nichols, and that she had to call Nichols in order to complete her

investigation.[87]

Tucker sent plaintiff a letter on November 13, 2006, informing her that she was

being placed on administrative leave pending an investigation of whether she was

following policies and procedures of Volunteers.[88]  The letter referenced the March

29, 2006 reprimand plaintiff received "for breach of confidentiality regarding

disciplining staff" and the July 24, 2006 reprimand plaintiff received "for releasing

negative reference information on a prospective applicant."[89]  The letter also enclosed

copies of each of the four reprimands plaintiff was issued on November 13, 2006, and

asked plaintiff to provide a response to each reprimand.[90]

In response to Tucker's letter and the reprimands referenced in it, plaintiff

---

144:12-148:6; doc. no. 42, Ex. A(15) (Volunteers of America, North Alabama Personnel Policies dated March 2006) 29.

[85] Affidavit of Cordia Bolden, Sept. 2, 2011, at ¶ 13.

[86] Deposition of Sonja King 144:12-146:17.

[87] Declaration of Sonja King 37-38.

[88] Doc. no. 42, Ex. A(6) (Letter to Sonja King dated Nov. 13, 2006).

[89] *Id.*

[90] *Id.*

submitted four letters to the Human Resources Department and/or Tucker on November 15th and 16th, 2006.[91]  Plaintiff did not mention any instance of racial harassment or discrimination in any of those letters.  Instead, plaintiff stated: "I love working with Volunteer's [*sic*] of America."[92]

Tucker directed a second letter to plaintiff on December 4, 2006, informing her that she was terminated.[93]  In the letter, Tucker stated that he made that decision for several reasons, including his conclusions that plaintiff:  (1) did not address the defective heating system in Group Home No. 26; (2) communicated with a Volunteers employee on administrative leave, in violation of company policy; and (3) allowed Cassandra Nichols to edit her own time-sheets, and did not monitor Nichols' work time.[94]

## III.  DISCUSSION

### A.    Racial Discrimination

Plaintiff alleges race-discrimination under both Title VII and § 1981.  The standards of proof and analytical framework are the same under both statutes.

---

[91] Deposition of Sonja King 224-33; doc. no. 42, Ex. A(12) (Letter dated Nov. 16, 2006); *id.* at  Ex. A(22) (Letter dated Nov. 15, 2006); *id.* at Ex. A(24) (Letter dated Nov. 16, 2006); *id.* at Ex. A(25) (Letter dated Nov. 15, 2006).

[92] Doc. no. 42, Ex. A(22) (Letter dated Nov. 15, 2006).

[93] Doc. no. 42, Ex. A(17) (Letter to Sonja King dated Dec. 4, 2006).

[94] *Id.*; Affidavit of Victor Tucker ¶ 15.

*Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998).

In its February 19, 2010 memorandum opinion, this court granted summary judgment against plaintiff on plaintiff's racial discrimination claims under both direct evidence and circumstantial evidence theories.[95]  In that opinion, this court held that plaintiff failed to produce any direct evidence that the decisionmaker in this case, Victor Tucker, had a racially discriminatory motivation in terminating plaintiff's employment.[96]  The court also held that**,** under the *McDonnell Douglas* analytical framework for evaluating claims based on circumstantial evidence, plaintiff failed to establish a *prima facie* case; but even if plaintiff had established a *prima facie* case, defendant produced evidence of nondiscriminatory reasons for the adverse employment action, and plaintiff produced no evidence to show that the asserted nondiscriminatory reasons were pretextual.[97]  As discussed *infra*, the court hereby adopts and incorporates its holdings from its February 19, 2010 memorandum opinion, to extent those holdings are consistent with the Supreme Court's holding in *Staub v. Proctor Hospital*, — U.S. —, 131 S. Ct. 1186 (2011), and the Eleventh Circuit's holding in *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321(11th Cir. 2011),

---

[95] Doc. no. 58, at 14-26.  This court also granted summary judgment against plaintiff on four of plaintiff's other claims.  Defendant did not move for summary judgment on plaintiff's racial harassment claim.  After this court granted summary judgment for defendant on February 19, 2010, plaintiff's racial harassment claim was the only claim remaining in the case.

[96] *Id.* at 14-15.

[97] *Id.* at 21-26.

both of which were decided after this court's opinion was entered.  Thus, the only race discrimination issues before the court are whether the *Staub* and *Smith* decisions, when applied to the facts warrant the denial of summary judgment.

### 1.      *Staub v. Proctor Hospital*

In *Staub v. Proctor Hospital*, — U.S. —, 131 S. Ct. 1186 (2011), the plaintiff was a military reservist employed by the defendant, a hospital. *Id.* at 1189.  Staub's two supervisors were hostile to his reservist status. *Id.*  One of Staub's supervisors issued him a disciplinary warning, and Staub was later reported to human resources for violating the disciplinary warning. *Id.*  The vice-president of human resources relied on Staub's supervisor's disciplinary warning and the reported violation of it to terminate Staub's employment. *Staub*, 131 S. Ct. at 1194.  Staub challenged his termination through his employer's grievance process and contended that both the original disciplinary warning and the later claimed violation of the disciplinary warning were false accusations. *Id.* at 1189-90.  Staub sued his employer under the USERRA, alleging that his employment was terminated due to hostility to his reservist status and obligations. *Id.* at 1190.  Staub's claim was not that the vice-president of human resources who made the decision to fire him had any hostility to his reservist status and obligations, but that his supervisors did, and that the supervisors' disciplinary actions influenced the vice-president of human resource's

ultimate employment decision. *Id.*  The Court reviewed the language in the USERRA providing for liability under the statute when a "person's membership [in the Reserves] is a motivating factor in the employer's action," and held that "if a supervisor performs an act motivated by antimilitary animus, that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable under [the Uniformed Services Employment and Reemployment Rights Act of 1994 ("USERRA"), 38 U.S.C. § 4301 *et seq.*]." *Staub*, 131 S. Ct. at 1190-91, 1194 (emphasis in original).

As an initial matter, this court is confronted with the issue of whether *Staub* applies only to the USERRA, or applies more generally to all employment discrimination statutes utilizing the same standard of liability.[98]  The *Staub* opinion's language indicates that the decision applies in employment discrimination cases generally, rather than only in USERRA cases.  The Court stated the issue in the case as "the circumstances under which an employer may be held liable *for employment discrimination* based on the discriminatory animus of an employee who influenced, but did not make, the ultimate employment decision."  *Staub*, 131 S. Ct. at 1189 (emphasis supplied).

Additionally, the language of the USERRA that controlled the *Staub* decision

---

[98] Defendants contend that the *Staub* holding is limited to USERRA cases. *See* doc. no. 77 (Brief in Support of Defendant's Motion for Summary Judgment) 14.

is nearly identical to the text of Title VII that controls this case, and the Court noted this similarity in the *Staub* decision. *Id.* ("The [USERRA] statute is very similar to Title VII."). Both statutes make adverse employment actions unlawful if a person's membership in a protected class is "a motivating factor" in an adverse employment action. The Court made clear that the identical language was essential to its decision by stating that "[t]he central difficulty in this case is construing the phrase 'motivating factor in the employer's action.'" *Id*.

The *Staub* opinion also relies extensively on Title VII jurisprudence in reaching its holding. *Id.* at 1191-94 (citing *Burlington Northern & Santa Fe Ry. Co. v. United States*, — U.S. —, 129 S. Ct. 1870 (2009); *Pennsylvania State Police v. Suders*, 542 U.S. 129 (2004); *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998)).

Finally, a review of cases decided after *Staub* reveals that lower courts uniformly apply the *Staub* decision in Title VII cases. *See Crowe v. ADT Sec. Services, Inc.*, — F.3d —, No. 10-1298, 2011 WL 1532536 (10th Cir. April 25, 2011); *Hampton v. Vilsack*, — F.Supp.2d —, No. 07-2221, 2011 WL 2341093 (D.D.C. June 14, 2011); *Cook v. IPC Intern. Corp.*, No. 09-275-GPM, 2011 WL 2173719, at *4-5 (S.D. Ill. June 2, 2011); *Allen v. Radio One of Texas II, LLC*, No. H-09-4088, 2011 WL 1527972, at *5 (S.D. Tex. April 20, 2011); *Igwe v. Saint*

23

*Anthony's Hosp.*, — F.Supp.2d —, No. CIV-10-0474-HE, 2011 WL 1343346, at *4 (W.D. Okla. April 8, 2011); *Memon v. Deloitte Consulting, LLP,* — F.Supp.2d —, No. H-09-2766, 2011 WL 1044051, at *17 (S.D. Tex. March 17, 2011) ("The Supreme Court's decision in [*Staub*], clarifies that an employer may be liable under Title VII even though there is no evidence of bias on the part of the final decisionmaker.").   Lower courts also apply *Staub* to non-USERRA employment discrimination claims other than those based on Title VII. *See Sirpal v. University of Miami*, No. 09-22662-CIV, 2011 WL 3101791, at *10-11 (S.D. Fla. July 25, 2011) (Title VI and § 1981 claims); *Grant v. Walgreen Co.*, No. 10-11392, 2011 WL 2079923, at *8-10 (E.D. Mich. May 25, 2011) (Age Discrimination in Employment Act claim).

This court holds that *Staub* applies beyond USERRA cases, and specifically applies to claims based upon both Title VII and § 1981 claims.  Because the *Staub* holding applies to Title VII claims, it also applies to claims based upon § 1981. *See Standard v. A.B.E.L. Services*, 161 F.3d at 1330.

*Staub* changed the law in so-called "cat's paw" cases.[99]  When the supervisor who manifested a discriminatory animus toward the plaintiff and the decisionmaker who ultimately inflicted the adverse employment action complained of are not one

---

[99] For the origin of the term "cat's paw," see *Staub*, 131 S. Ct. at 1190, n.1.

and the same, plaintiffs sometimes attempt to supply the missing link in the causal chain by arguing that the supervisor who manifested the discriminatory animus manipulated the decisionmaker into taking the adverse employment action. *See, e.g.*, *Llampallas v. Mini-Circuits, Lab, Inc.*, 163 F.3d 1236, 1249 (11th Cir. 1998).

Prior to *Staub*, courts understood the cat's paw theory as requiring a showing that the supervisor harboring the discriminatory animus was the "but for" cause of the adverse employment action.  For example, in *Llampallas v. Mini-Circuits, Lab, Inc.*, the Eleventh Circuit held that "[i]n a cat's paw situation, the [discriminatory supervisor] *clearly causes* the tangible employment action, regardless of which individual actually signs the employee's walking papers," and "[i]n effect, the [discriminatory supervisor] *is* the decisionmaker, and the titular 'decisionmaker' is a mere conduit for the [supervisor's] discriminatory animus." *Id.* (emphasis supplied). In the Seventh Circuit opinion reversed by the Supreme Court in *Staub*, the Seventh Circuit "explained that under Seventh Circuit precedent, a 'cat's paw' case could not succeed unless the non-decisionmaker exercised such 'singular influence' over the decisionmaker that the decision to terminate was the product of 'blind reliance.'" *Staub*, 131 S. Ct. at 1190 (quoting *Staub v. Proctor Hospital*, 560 F.3d 647, 659 (7th Cir. 2009)).

In *Staub*, the Court clarified that, so long as a supervisor performed an act

25

motivated by discriminatory animus that was intended to cause an adverse employment action, the employer is liable if that act was a *proximate cause* of the adverse employment action. *Id.* at 1194 (emphasis supplied).  Thus, to succeed on a cat's paw theory of liability, a plaintiff no longer must show that the discriminatory animus of a supervisor was the "but for" cause of the adverse employment action. Instead, a plaintiff must only show that a supervisor's discriminatory animus was the *proximate* cause.

Here, plaintiff fails to present evidence to establish that her allegedly racially discriminatory supervisor, Stephenson, *took actions, motivated by racial animus*, that were the proximate cause of plaintiff's adverse employment action.  Further, plaintiff's bare assertion that persons generally acted at Stephenson's direction — *i.e.*, that Stephenson directed, manipulated, or coerced others into complaining about and investigating plaintiff so that Stephenson could then issue plaintiff reprimands for the purpose of having plaintiff terminated — is not supported by the evidence of record.[100] *See Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) ("[M]ere

---

[100] *See* Deposition of Sonja King 54:7-11 ("Staff had told me that Teresa had them [say] things about me and told – Teresa told them what to say about me as far as complaining because she wanted me to get out of there."); Declaration of Teresa Slatton ¶ 6 ("I personally observed that Teresa Stephenson used [Volunteers'] employees, especially black employees, against other black employees at [Volunteers].   I personally observed that Teresa Stephenson would instruct [Volunteers'] employees, especially black supervisors, to make up falsehoods about black employees so the black employees could be fired."); Declaration of Natasha Yolanda Fuqua ¶ 9 ("Teresa Stephenson would have [Volunteers'] employees write false statements about black employees when she wanted to get rid of a black employee . . ."); *see also* doc. no. 81, at 35-37.

conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion.").  The record contains no evidence to show that a *particular* complaint or investigation resulting in any reprimand was the result of staff acting at the direction or due to the coercion of Stephenson, and the record contains no evidence that Stephenson actually conspired against *plaintiff*.

Plaintiff's March 2006 reprimand for improperly disciplining a staff member in front of other staff members arose as a result of a complaint by an unspecified staff member or members.[101]  The March 2006 reprimand was issued at the direction of Bolden in the Human Resources Department.[102]  The July 2006 reprimand for improperly providing a reference for a former employee arose as a result of a complaint by the former employee, Latoya Parks Hardy.[103]  Tucker initiated the investigation, and the reprimand was issued at the direction of Bolden.[104]  The November 2006 reprimand for failing to repair the heating unit in Group Home No. 26 arose as a result of a complaint made by an employee of Volunteers working in the house, and the reprimand was issued by Stephenson at the direction of others.[105]  The

---

[101] Affidavit of Teresa Stephenson ¶ 7, Ex. A(1).

[102] *Id.* at ¶ 7, Ex. A.

[103] Affidavit of Victor Tucker ¶ 17, Ex. 8.

[104] Affidavit of Teresa Stephenson ¶ 8; Affidavit of Victor Tucker ¶ 17.

[105] Affidavit of Teresa Stephenson ¶ 10, Ex. C; Affidavit of Cordia Bolden, Sept. 2, 2011, at ¶ 9.

three reprimands plaintiff received in November 2006 for the incident involving Nichols' timesheets arose as a result of an investigation begun by Susan Hester in the payroll department,[106] and those reprimands were all issued at Bolden's direction.[107]

Plaintiff presents no evidence that any of the persons who made complaints, initiated investigations, or ordered the issuance of reprimands — Bolden, Bucklin, Latoya Parks Hardy, Tucker, or unspecified employees of Volunteers — harbored a racially discriminatory animus.  The record shows that Stephenson only issued reprimands at the direction of others, rather than making decisions based on her racial animus.  Because plaintiff fails to present any evidence that the proximate cause of her termination — the complaints, investigations, and reprimands — were acts performed by, or instigated by, persons with a racial animus, plaintiff cannot show that her supervisor performed an act *motivated by a racially discriminatory animus*, as required for liability under *Staub*.

## 2.     *Smith v. Lockheed Martin Corporation*

---

[106] Affidavit of Cordia Bolden, Sept. 2, 2011, at ¶ 10.

[107] *Id.* at ¶ 9 ("Teresa [Stephenson] did not give Sonja any reprimands without the involvement of Human Resources and/or Mr. Tucker."); *id.* at ¶ 13 ("Per Mr. Tucker's instructions, I asked Teresa [Stephenson] to prepare written reprimands about Sonja's lack of cooperation in the investigation and her contact with Renee [Nichols] while Renee was on Administrative Leave."); Affidavit of Teresa Stephenson ¶ 10 ("Exhibits C, D, E and F were four other [reprimands] I also completed in conjunction with instructions from HR. I was told by HR and/or Mr. Tucker to complete them and give to HR, which would enclose them with the letter placing Sonja on Administrative Leave.").

In *Smith v. Lockheed Martin Corp.*, 644 F.3d 1321 (11th Cir. 2011), Mitten, a white Lockheed employee and the plaintiff, received a racially offensive email and forwarded it to his supervisor in violation of company policy. *Id.* at 1324. Mitten's employment was terminated when Lockheed's human resources department learned of his violation of company policy. *Id.* Mitten later learned that two black employees had also violated the policy, but the two black employees received only temporary suspensions. *Id.* Mitten brought suit against Lockheed, alleging violations of Title VII and § 1981. *Id.* The district court analyzed Mitten's claim of race discrimination under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and entered summary judgment against Mitten. *Id.* at 1325. The district court held that Mitten failed to meet the fourth element of the *McDonnell Douglas prima facie* case, because Mitten could not show that he was disciplined less favorably than similarly situated persons of other races. *Id.* at 1326. Mitten was able to show that the two black employees who forwarded racially offensive emails were treated differently, but those two employees were not similarly situated — not proper comparators — for *McDonnell Douglas* purposes, because they were in non-supervisory positions, whereas Mitten held a supervisory position. *Id.* at 1326-27.

Mitten appealed on the grounds that "he [did] not need a black supervisor comparator because the record contains sufficient circumstantial evidence to create

29

a triable issue of fact as to whether Lockheed fired him because he is white." *Id.* at 1327.  The Eleventh Circuit ruled for Mitten, holding that the *McDonnell Douglas* analytical framework is not "the *sine qua non* for a plaintiff to survive a summary judgment motion in [a circumstantial evidence] employment discrimination case." *Id*. at 1328.  "The plaintiff will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Id.*

*Smith* and this case are distinguishable on their facts.  In *Smith*, Mitten presented extensive evidence that Lockheed was motivated to respond disproportionately to white employees' violations of the company's policy committed by whites due to negative publicity the company had received concerning other violations of its non-discrimination policies. *See id.* at 1329-31.  Mitten also presented circumstantial evidence that race played a role in Lockheed's decision as to which employees to terminate for violations of the company's policy. *See id.* at 1335-36.  Ultimately, the Eleventh Circuit concluded that:

> The foregoing circumstantial facts preclude summary judgment in this case as a jury reasonably could infer that Lockheed only fired Mitten because he is white. The evidence yields this inference because it: (1) suggests that Lockheed's justification for firing Mitten is a pretext for racial animus; (2) shows that Lockheed had a substantial incentive to discipline white employees more harshly than black employees in the summer of 2005; and (3) indicates clearly that Lockheed consciously

injected race considerations into its discipline decision making without an adequate explanation for doing so.

*Id.* at 1341.

There are no such special circumstances present here, and no circumstantial evidence to permit a reasonable jury to infer that plaintiff's employment was terminated because she is black.  Reviewing the evidence in the light most favorable to plaintiff, and drawing all reasonable inferences in plaintiff's favor, plaintiff's evidence shows that Stephenson and several other employees of Volunteers — specifically Melissa Castle, Sarah Rickard, Debra Williamson, Carrie Rickard, and Amy Johnson — harbored a racially discriminatory animus, and desired that blacks suffer adverse employment actions.[108]  Even so, plaintiff's circumstantial evidence is not sufficient to allow her race discrimination claim to survive a motion for summary judgment because, as discussed in Part III(A)(1), *supra*, plaintiff presents no evidence that the ultimate decisionmaker, or any person who took an action that may be the proximate cause of plaintiff's termination, had a racially discriminatory animus.

**B.    Retaliation**

As noted in the beginning of this opinion, this court previously granted summary judgment for defendant on plaintiff's retaliation claim.[109]  Defendant asserts

---

[108] *See* doc. no. 81, at 27-38.

[109] *See* doc. no. 58 (Memorandum Opinion on Defendant's Motion for Summary Judgment).

that the law has not changed with respect to retaliation and thus, the law of the case doctrine prevents this court from reconsidering its previous ruling.[110]  However, there are several exceptions to that doctrine, one of which applies to this case.

In the previous summary judgment memorandum opinion entered on February 19, 2010,[111] this court erred in considering plaintiff's retaliation claim.  In the Facts part of that opinion, this court found that:  "Plaintiff also alleges in her statement of facts that she 'complained to [Tucker],' but provides no details about either the substance or circumstances of the complaint."[112]  However, upon further review of the record, the court must acknowledge that plaintiff *did*, and does, provide details about a complaint to Tucker in March 2006.[113]  In March 2006, plaintiff spoke to Tucker at the main office of Volunteers in Huntsville, Alabama, and "told Victor Tucker how blacks were being racially discriminated against and racially harassed on the job and asked him to stop it."[114]

This court also erred in the discussion of plaintiff's retaliation claim when it held:

---

[110] *See* doc. no. 84 (Defendant's Reply in Support of Motion for Summary Judgment on the Amended Complaint) 6.

[111] *See* doc. no. 58.

[112] *Id.* at 7.

[113] *See* Declaration of Sonja King 24; Deposition of Sonja King 208:19-209:13.

[114] Declaration of Sonja King 24.

> Even so, plaintiff has not shown that Victor Tucker, who made the decision to place [plaintiff] on administrative leave, and, ultimately, to terminate her employment, was aware of these complaints of discrimination prior to making the relevant decisions.   In her declaration, plaintiff explains that she attempted to meet with Mr. Tucker to discuss her concerns, and that Mr. Tucker offered to set up such a meeting.   Plaintiff admits, however, that she never actually met with him.[115]

However, contrary to this court's previous holding, Tucker did know of at least one complaint of discrimination by plaintiff, because plaintiff complained *to Tucker* that "blacks were being racially discriminated against and racially harassed on the job."[116]

The law of the case doctrine provides that a court generally is bound by prior findings of fact and conclusions of law in the same case. *See Wheeler v. City of Pleasant Grove*, 746 F.2d 1437 (11th Cir. 1984); *see also Annunziata v. School Board of Miami-Dade County*, No. 04-12560, 2005 WL 591205 (11th Cir. 2005) (applying the law of the case doctrine to reconsideration of a grant of summary judgment). However, a court may reconsider its previous findings of fact and conclusions of law when "the prior decision was clearly erroneous and would work manifest injustice." *Wheeler*, 746 F.2d at 1440; *see also* Fed. R. Civ. P. 60(b)(1).[117]   This court's prior

---

[115] Doc. no. 58, at 28 (citations omitted).

[116] *See* Declaration of Sonja King 24.

[117] Ordinarily, a motion for reconsideration would be necessary for this court to reconsider its previous ruling.   However, to the extent that a motion for reconsideration and a grant of relief under Federal Rule of Civil Procedure 60(b) is necessary to reconsider plaintiff's retaliation claim, the court construes plaintiff's response in opposition to defendant's motion for summary judgment on plaintiff's amended complaint as requesting such relief when it illuminates the discrepancy

decision was clearly erroneous, and not reconsidering plaintiff's retaliation claim would work manifest injustice.  "[D]elay is preferable to error,"[118] and, after some delay, this court corrects its previous error.

Title VII prohibits retaliation against an employee "because [s]he has opposed any practice made an unlawful employment practice by [Title VII], or because she has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing [thereunder]." 42 U.S.C. § 2000e-3(a).  Plaintiff presents no direct evidence of retaliatory motive and in the absence of direct evidence, the *McDonnell Douglas* burden-shifting analysis applies to retaliation claims. *See Hurlbert v. St. Mary's Health Care System, Inc.*, 439 F.3d 1286, 1297 (11th Cir. 2006).  Under that formulation, a plaintiff must make out a *prima facie* case of retaliation by showing that:  (1) plaintiff engaged in a statutorily protected activity, (2) plaintiff suffered a materially adverse action, and (3) there is a causal connection between plaintiff's protected activity and the materially adverse action suffered. *Id.* "If the plaintiff makes out a *prima facie* case, the burden then shifts to the defendant

---

between the record and this court's previous findings, and additionally, this court *sua sponte* grants relief from the prior order and opinion because such relief is necessary to avoid a mistake. *See* Fed. R. Civ. P. 60(b) ("On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; . . . .").

[118] Thomas Jefferson, Letter to George Washington (16 May 1792), *available at* http://memory.loc.gov/ammem/collections/jefferson_papers/.

to articulate a legitimate reason for the adverse action." *Id.* at 1297. "If the defendant does so, the plaintiff must then show that the defendant's proffered reason for the adverse action is pretextual." *Id.*

Plaintiff's theory of liability on her retaliation claim centers on the argument that Stephenson was the decisionmaker.[119]   This court held in its previous memorandum opinion, and in Part III(A)(1) of this memorandum opinion, that plaintiff failed to present evidence to establish that Stephenson was the decisionmaker or acted as such through a cat's paw theory.[120]   It is not the place of this court to step into the shoes of a litigant on summary judgment and formulate arguments that, for whatever reason, the party chose not to make. *United States v. Docampo,* 573 F.3d 1091, 1103 (11th Cir. 2009).   However, to the extent that plaintiff's brief can be construed as asserting that someone other than Stephenson took materially adverse actions against plaintiff because of her protected activities, plaintiff fails to present sufficient evidence to establish the necessary elements of such a claim.

1.     *Prima facie* case

    a.     **Protected activity**

Plaintiff alleges she engaged in protected opposition activity.  Informally

---

[119] *See* doc. no. 81, at 43 ("Stephenson was the decisionmaker.").

[120] *See* doc. no. 58.

voicing complaints to superiors is protected opposition activity. *Rollins v. Florida Department of Law Enforcement*, 868 F.2d 397, 400 (11th Cir. 1989).   Plaintiff complained to Tucker in March 2006 and Bolden and Bucklin in August or September 2006 about racial harassment and discrimination.   Defendant does not dispute the reasonableness of plaintiff's belief that the conduct she complained of violated Title VII.   Therefore, plaintiff satisfies the first element of a *prima facie* retaliation claim.

### b.    Adverse action

For the second element of a *prima facie* retaliation claim, plaintiff must show that she suffered an adverse action and the definition of an adverse action for this purpose is different from the definition in the disparate treatment context. *See Burlington Northern*, 548 U.S. at 61.  For employer conduct to be adverse and violate Title VII's anti-retaliation provision, the conduct only must be conduct that a reasonable person would find materially adverse, which means that it may deter an employee from reporting discrimination. *Id*. at 68.

Plaintiff alleges she suffered retaliation "in the form of reprimands and Administrative Leave" as a result of her complaints about racially offensive behavior by employees of Volunteers.[121]   However, the reprimands plaintiff received on March

---

[121] Declaration of Sonja King 44.

29, 2006,[122] and July 24, 2006,[123] were not materially adverse actions.  Those reprimands merely documented employment problems, and stated the corrective actions taken to avoid future problems.[124]  The record contains no evidence that the written reprimands resulted in an "injury or harm" to plaintiff. *See Burlington Northern*, 548 U.S. at 67 ("The antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm.").  Because the written reprimands would not, alone, cause plaintiff any injury or harm, they would not deter a reasonable victim of discrimination from complaining about or reporting discrimination. *See Burlington Northern*, 548 U.S. at 68, 70; *see also Jones v. Johanns*, 264 Fed. Appx. 463, 469 (6th Cir. 2007) (finding a reprimand letter which stated that failure to follow the instructions contained within it "*may* result in official disciplinary action" was not a materially adverse action because it would not "dissuade a reasonable employee from making or supporting a charge of discrimination") (emphasis in original).

The remaining actions plaintiff claims were retaliation are the four reprimands issued to her on November 13, 2006, being placed on administrative leave on the same date, and being terminated on December 4, 2006.  The administrative leave and

---

[122] *See* Affidavit of Teresa Stephenson, Ex. A.

[123] *See id.* at Ex. B.

[124] *See id.* at Ex. A-B.

termination would deter a reasonable employee from reporting discrimination, and are thus materially adverse. The four reprimands issued on November 13, 2006 were materially adverse because they were issued the day plaintiff was placed on administrative leave and caused her administrative leave and termination. In other words, the reprimands issued to plaintiff on November 13, 2006, are inseparable from her administrative leave and termination.

### c.    Causation

The third element of the *prima facie* retaliation case, the causation element, requires knowledge of the protected activity by the ultimate decisionmaker. *Brungart v. Bellsouth Telecommunications*, *Inc.*, 231 F.3d 791, 799 (11th Cir. 2000) ("[T]he plaintiff must generally show that the decision maker was aware of the protected conduct at the time of the adverse employment action."). If the decisionmaker did not have knowledge of the protected activity, then the protected activity could not have been the cause of the decisionmaker's actions. *Id.* at 798-99.

Once knowledge by the decisionmaker is established, the causation element may be satisfied by showing a close temporal proximity between the protected activity and the materially adverse action, or by showing other evidence of a retaliatory motive. *See Hankins v. AirTran Airways, Inc.*, 237 Fed. Appx. 513, 520 (11th Cir. 2007). Temporal proximity is considered in relation to the totality of the

38

evidence, and thus, is not defined by a set period of time, but rather is considered in light of the facts of the case. *Id*. at 520.

Plaintiff fails to present evidence of a causal link between her protected activity and the materially adverse actions suffered however; and, thus, plaintiff fails to make out the third element of a *prima facie* case of retaliation.  In March 2006, Plaintiff complained to Tucker about racial discrimination and harassment, a protected activity under Title VII.[125]  Plaintiff did not suffer an adverse action until November 13, 2006, when she was placed on administrative leave.  The passage of seven months between the protected activity of complaining to Tucker and the adverse action is too long to establish close temporal proximity and an inference of causation. *See, e.g.*, *Wascura v. City of South Miami*, 257 F.3d 1238 (11th Cir. 2001) ("In light of the other evidence in the record, the three and one-half month temporal proximity is insufficient to create a jury issue on causation."). Furthermore, plaintiff presents no evidence of causation other than temporal proximity, and the intervening causes of plaintiff's disciplinary problems involving the heater in Group Home No. 26 and Nichols editing her own timesheets occurred in the interim. *See Hankins*, 237 Fed. Appx. at 520 (acknowledging that close temporal proximity is not defined as a set period of time, but is determined by the totality of the circumstances, and holding that

---

[125] Declaration of Sonja King 24; Deposition of Sonja King 208:19-209:13.

intervening events may break the chain of causation).

Plaintiff also complained about racial discrimination and harassment, a protected activity, to Bolden and Bucklin in the Human Resources Department of Volunteers in August or September 2006.[126]  Plaintiff fails to present any evidence that Tucker, the decisionmaker, was made aware of this complaint.  Plaintiff thus fails to establish a genuine issue of material fact as to whether Tucker had knowledge of this protected activity, and therefore cannot establish the causation element of a *prima facie* case.

## 2.  Defendant's non-discriminatory reasons and plaintiff's burden to establish pre-text

"If the plaintiff makes out a *prima facie* case, the burden shifts to the defendant to articulate a legitimate reason for the adverse action." *Hurlbert*, 439 F.3d at 1297. If the defendant does so, the plaintiff must then show that the defendant's proffered reason for the adverse action is a pretext for retaliation. *See id.*  "A plaintiff [may prove pretext] either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."). *See Carter v. City of Miami*, 870 F.2d 578, 584 (11th Cir. 1989) (citations and quotations omitted).

Even if plaintiff could be found to have established a *prima facie* case of

---

[126] Declaration of Sonja King 31.

retaliation, defendant presents evidence rebutting plaintiff's *prima facie* case, and plaintiff fails to present evidence to show that defendant's rebuttal is pretextual. Defendant presents evidence that each reprimand was the result of a violation of company policy by plaintiff, and that Tucker placing plaintiff on administrative leave and terminating plaintiff's employment were the result of plaintiff repeatedly violating company policy.  Plaintiff presents no evidence that a retaliatory motive more likely influenced Tucker, nor any evidence that defendant's proffered reasons are not worthy of credence.  Plaintiff generally alleges that, while her actions may have violated company policy, she should not be held responsible for those violations because she was only acting at Stephenson's direction.[127]  However, "the pretext inquiry is concerned with the employer's perception of the employee's performance, not the employee's own beliefs." *Hankins*, 237 Fed. Appx. at 521.  Plaintiff does not present evidence that Tucker had any reason to perceive plaintiff's actions as anything other than violations of the personnel policies of Volunteers.

Because plaintiff cannot establish the adverse action element for some of the actions she alleges were retaliation and cannot establish the causation element, and because defendant presents non-discriminatory reasons for the adverse actions plaintiff suffered and plaintiff cannot establish pre-text, summary judgment is due to

---

[127] *See*, *e.g.*, Declaration of Sonja King 37-38 (stating that plaintiff called Nichols while Nichols was on administrative leave because Stephenson instructed her to).

be granted on plaintiff's retaliation claim.

**C.    Harassment**

"In order to prove a claim for a racially hostile work environment, a plaintiff must 'demonstrate that the actions of the defendants altered the conditions of the workplace, creating an objectively abusive and hostile atmosphere.'" *Jackson v. Motel 6 Multipurpose, Inc.*, 130 F.3d 999, 1008 n.17 (11th Cir. 1997) (quoting *Edwards v. Wallace Community College*, 49 F.3d 1517, 1521 (11th Cir. 1995)).  A *prima facie* racially hostile work environment claim has five elements:  (1) the employee belongs to a class of persons protected by Title VII or § 1981; (2) the employee was subjected to unwelcome harassment; (3) the harassment complained of was based upon the employee's race; (4) the harassment was sufficiently severe or pervasive to alter the terms or conditions of employment and created a discriminatorily abusive working environment; and (5) the employer is responsible under a theory of either direct or vicarious liability.  *See, e.g., Bivins v. Jeffers Vet Supply*, 873 F. Supp. 1500, 1507 (M.D. Ala. 1994).  *Cf. Miller,* 277 F.3d at 1275 (harassment based on the plaintiff's national origin); *Henson v. City of Dundee*, 682 F.2d 897, 903-05 (11th Cir. 1982) (sexual harassment).  This court assumes the first four elements of the *prima facie* case are satisfied, and focuses on whether plaintiff can establish the fifth element.

The fifth element of the *prima facie* case was summarized by the Eleventh

Circuit in the following manner:

> An employer "is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." *Faragher v. City of Boca Raton*, 524 U.S. 775, 807, 118 S. Ct. 2275, 2292-93, 141 L. Ed. 2d 662 (1998). The employer will be strictly liable for the hostile environment if the supervisor takes [a] tangible employment action against the victim. *See id.* at 807, 118 S. Ct. at 2293. However, when an employee has established a claim for vicarious liability but where no tangible employment action was taken, a defending employer may raise as an affirmative defense to liability or damages: "(a) that the employer exercised reasonable care to prevent and correct promptly any . . . harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Id.* at 807, 118 S. Ct. at 2292-93. Where the perpetrator of the harassment is merely a co-employee of the victim, the employer will be held directly liable if it knew or should have known of the harassing conduct but failed to take prompt remedial action. *See Breda v. Wolf Camera & Video*, 222 F.3d 886, 889 (11th Cir.2000). Thus, a victim of coworker harassment must show either actual knowledge on the part of the employer or conduct sufficiently severe and pervasive as to constitute constructive knowledge to the employer. *See id.*
>
> . . . .
>
> Actual notice is established by proof that management knew of the harassment, whereas constructive notice will be found where the harassment was so severe and pervasive that management should have known of it. . . .

*Miller,* 277 F.3d at 1278.

"[W]hen the supervisor's harassment involves no adverse "tangible employment action," an employer can avoid vicarious liability for the supervisor's conduct by raising and proving the affirmative defense described in the [*Faragher v. City of Boca Raton*, 524 U.S. 775 (1998)] and [*Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998)] cases." *Frederick v. Sprint/United Management Co.*, 246 F.3d 1305, 1311 (11th Cir. 2001). "Both elements [of the affirmative defense] must be satisfied for the defendant-employer to avoid liability, and the defendant bears the burden of proof on both elements." *Frederick*, 246 F.3d at 1313 (citations omitted).

### 1.    First element of the affirmative defense — the employer's duties

To satisfy the first element, a defendant must establish both a prevention prong and a remedial prong. To establish the prevention prong, the defendant must establish:  (1) that it has "promulgated an effective and comprehensive" anti-harassment policy, *Miller*, 277 F.3d at 1279 (quoting *Farley v. American Cast Iron Pipe Co.*, 115 F.3d 1548, 1554 (11th Cir. 1997)); (2) containing complaint procedures that are "'designed to encourage victims of harassment to come forward without requiring a victim to complain first to the offending supervisor,'" *Faragher*, 524 U.S. at 806; and (3) that the policy was "aggressively and thoroughly disseminated" to its employees. *Miller*, 277 F.3d at 1279 (quoting *Farley v. American Cast Iron Pipe Co.*, 115 F.3d at 1154); *see also, e.g., Frederick*, 246 F.3d at 1314 (holding that an

44

employer is "required to show that its sexual harassment policy was effectively published, that it contained reasonable complaint procedures, and that it contained no other fatal defect") (citing *Madray v. Publix Supermarkets, Inc.*, 208 F.3d 1290, 1298-99 (11th Cir. 2000)).

The second, or "remedial," prong of the first element requires the employer to exercise reasonable care to promptly correct any harassing behavior. "[A]n employer need not act instantaneously, but must act in a reasonably prompt manner to respond to the employee's complaint." *Frederick*, 246 F.3d at 1314 (citing *Madray*, 208 F.3d at 1302). However, the employer's obligation to exercise reasonable care to promptly correct any harassing behavior does not arise until the employee provides the employer with adequate notice of the harassment. *See Coates v. Sundor Brands, Inc.*, 164 F.3d 1361, 1364 (11th Cir. 1999). Thus, it is only when the court determines that adequate notice of the harassment *was given* by the complaining employee in accordance with the employer's policy that the court may proceed to a second level of inquiry — that of determining whether the employer took reasonably prompt and appropriate remedial action. *Id.*

Volunteers presents undisputed evidence that it had an anti-harassment policy which provided for employee reporting of harassment, investigations of alleged harassment, remedial actions against harassers, and a method for employees to report

45

to a person other than their harasser.[128]   Plaintiff acknowledges receiving a copy of the employee handbook containing the anti-harassment policy.[129]   Therefore, Volunteers satisfies the prevention prong of the first element of the *Faragher/Ellerth* affirmative defense.

Plaintiff presents evidence that she gave adequate notice of the alleged harassment. The anti-harassment policy of Volunteers provides that employees are to report perceived harassment to their supervisor, the Human Resources Department, or the CEO of Volunteers.[130]   Plaintiff complained about perceived harassment to Tucker, the CEO, and to Bolden and Bucklin in the Human Resources Department.[131]

The response by Volunteers was reasonably prompt and appropriate.  Plaintiff alleges that, in March 2006, she told Tucker that black individuals were being "mistreated," and she asked Tucker what he could do about it.[132]   Tucker stated he was busy at that exact moment and directed Plaintiff to email him with her complaints and to set up a time for them to meet.[133]   Tucker suggested that they meet at an Applebee's in Athens, Alabama, approximately halfway between plaintiff's home and

---

[128] Doc. no. 42, Ex. A(15) (the personnel policies of Volunteers) 36-37.

[129] Deposition of Sonja King at 120:8-21.

[130] Doc. no. 42, Ex. A(15) (the personnel policies of Volunteers) 36-37.

[131] Declaration of Sonja King 24, 31; Deposition of Sonja King 208:19-209:13.

[132] *Id.* at 209:2-7.

[133] Declaration of Sonja King 24.

Tucker's office.[134]  Tucker's directions to plaintiff to submit her complaints to him via email and to meet him to discuss her complaints were reasonably prompt, as they were made at the time plaintiff initially complained, and were reasonably appropriate because the first step in addressing harassment is to initiate an investigation. *See Baldwin v. Blue Cross/Blue Shield of Alabama*, 480 F.3d 1287, 1303 (11th Cir. 2007) ("A threshold step in correcting harassment is to determine if any occurred, and that requires an investigation . . . .").  Therefore, Volunteers satisfies the remedial prong of the first element of the *Faragher/Ellerth* affirmative defense.

> **b.    Second element of the affirmative defense — the plaintiff's duties**

"The second element of the *Faragher/Ellerth* affirmative defense requires that [defendant] show that [the plaintiff] unreasonably failed to take advantage of [the employer's] complaint procedures or otherwise avoid harm." *Frederick*, 246 F.3d at 1315 (citations omitted).  If an employer promulgates and effectively disseminates a sexual harassment policy designed to encourage victims of harassment to come forward, by allowing victims to bypass offending supervisors, then "it is incumbent upon the employees to utilize the procedural mechanisms established by the company specifically to address problems and grievances." *Madray*, 208 F.3d at 1300 (quoting *Farley v. American Cast Iron Pipe Co.*, 115 F.3d at 1554); *see also Young v. Bayer*

---

[134] Deposition of Sonja King 209:7-210:6.

*Corp.*, 123 F.3d 672, 674 (7th Cir. 1997) (noting that, when an employer has identified and appointed a recipient for sexual harassment complaints, "complainants can be expected to utilize it").

A complainant in a hostile work environment action does not have the right to a remedy of her choice. *See Baldwin*, 480 F.3d at 1306. Rather, the complainant has the right to reasonably prompt and appropriate remedial action. *Coates*, 164 F.3d at 1364. However, if the plaintiff demonstrates that her failure to comply with the employer's complaint procedures was reasonable under the circumstances the defendant cannot satisfy the second element of the affirmative defense. *Frederick*, 246 F.3d at 1314, 1315-16.

Plaintiff testified that she ignored Tucker's attempt to initiate an investigation of the alleged harassment.[135] She never emailed Tucker her complaints, nor did she meet with Tucker at Applebee's as Tucker suggested, or at any other place.[136] Plaintiff testified that she did not email Tucker because he suggested they meet at Applebee's.[137] She testified that she did not meet Tucker at Applebee's because she was uncomfortable meeting the CEO of a business alone at a restaurant.[138] Plaintiff's

---

[135] Deposition of Sonja King 209:25-211:23.

[136] *Id.*

[137] *Id.* at 209:25-210:6.

[138] *Id.* at 211:5-23.

48

explanations for why she did not email or meet with Tucker are not reasonable under the circumstances as he asked to meet in a convenient, public place.  Furthermore, plaintiff failed to convey her alleged reservations about meeting Tucker at Applebee's, and ceased all communications with Tucker concerning the perceived harassment.[139]  Therefore, because plaintiff presents evidence that she unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer, Volunteers establishes the second element of the *Faragher/Ellerth* affirmative defense.  Because plaintiff's own evidence establishes both elements of the *Faragher/Ellerth* affirmative defense, plaintiff cannot establish the fifth element of a *prima facie* case of racially hostile work environment, and summary judgment is due to be granted on plaintiff's racial harassment claim.

## IV.  CONCLUSION

For all of the foregoing reasons, defendant's motion for summary judgment will be granted on all claims.  An appropriate order consistent with this memorandum opinion will be entered contemporaneously herewith.

DONE this 6th day of October, 2011.

_____
United States District Judge

---

[139] *Id.*

49